UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KAHRAMAN SADIKOĞLU,

Plaintiff,

- vs -

UNITED NATIONS DEVELOPMENT PROGRAMME

Defendant.

No. 11-cv-0294 (PKC)

## PLAINTI FF'S MEMORANDUM REGARDING LACK OF IMMUNITY, SERVICE OF PROCESS, AND JURIDICAL CAPACITY, WITH RESPECT TO THE UNITED NATIONS DEVELOPMENT PROGRAMME

Robert C. Sentner
Edward C. O'Callaghan
Amanda L. Devereux
Sherli Yeroushalmi
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
(212) 940-3000

*Attorneys for Plaintiff*

April 18, 2011

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................- 1 -

BACKGROUND ................................................................................................- 1 -

LEGAL ARGUMENT ........................................................................................- 5 -

I.  UNDP IS NOT IMMUNE WITH RESPECT TO THE CLAIMS AT ISSUE IN THIS DISPUTE. ................................................................................................- 5 -

A. The Immunity Conferred upon the United Nations and Its Agencies Is a Functional Immunity Pursuant to Articles 103 and 105 of the Charter of the United Nations ........- 5 -

B. The Privileges and Immunities of UNDP Do Not Extend to Its Involvement in Commercial Activities. ................................................................................................- 8 -

C. This Court Has Subject Matter Jurisdiction Pursuant to the IOIA and FSIA. ..............- 10 -

1.  Commercial Activity................................................................................................- 13 -

2.  Direct Effect in the United States ............................................................................- 13 -

D. In Any Event, the Commercial Activities Involved in This Dispute Are Outside the Legitimate Functions of UNDP and, Therefore, Are Not Subject to UNDP's Privileges and Immunities................................................................................................- 14 -

E. If Jurisdiction is Not Exercised, Plaintiff Will Have No Forum Available to Resolve His Contract Dispute with UNDP, Resulting in a Fundamental Denial of Justice. ............- 15 -

II.  UNDP HAS BEEN PROPERLY SERVED IN THIS ACTION. ......................................- 17 -

A. Plaintiff's Counsel Has Repeatedly Sought to Serve UNDP and Confer with Counsel for UNDP................................................................................................- 17 -

B. The Methods of Service Employed by Plaintiff's Counsel Satisfy All Legal Requirements. ................................................................................................- 20 -

C. Should the Court Find That Service Has Not Been Effectuated, The Court Should Tailor An Alternative Under Federal Rules of Civil Procedure ("FRCP") Rule 4(f)(3).......- 22 -

III.  UNDP IS AN INDEPENDENT AND DISTINCT LEGAL ENTITY FULLY CAPABLE OF APPEARING IN THIS ACTION................................................................................- 24 -

CONCLUSION................................................................................................- 25 -

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Askir v. Boutros-Ghali,*
    933 F. Supp. 368 (S.D.N.Y. 1996) ...................................................................................8, 12

*Bisson v. United Nations,*
    No. 06-cv-6352 (PAC) (AJP), 2007 U.S. Dist. LEXIS 54334
    (S.D.N.Y. July 27, 2007) .............................................................................................12, 20

*Boimah v. United Nations Gen. Assembly,*
    664 F. Supp. 69 (E.D.N.Y. 1987) ...................................................................................8, 23

*Broadbent v. Org. of Am. States,*
    628 F.2d 27 (D.C. Cir. 1980) .............................................................................................12

*Brzak v. United Nations,*
    551 F. Supp. 2d 313 (S.D.N.Y. 2008)..........................................................................19, 20

*Brzak v. United Nations,*
    597 F.3d 107 (2d Cir. 2010)...............................................................................................12

*Chevron Corp. v. Donziger,*
    No. 11-cv-0691 (LAK), 2011 U.S. Dist. LEXIS 22729
    (S.D.N.Y. Mar. 7, 2011) ....................................................................................................21

*D.R.I., Inc. v. Dennis,*
    No. 03-cv-10026 (PKL), 2004 U.S. Dist. LEXIS 22541
    (S.D.N.Y. June 3, 2004)........................................................................................... 27 & n.6

*DeLuca v. United Nations,*
    841 F. Supp. 531 (S.D.N.Y. 1994) .....................................................................................20

*Fuentes-Argueta v. INS,*
    101 F.3d 867 (2d Cir. 1996)................................................................................................21

*Hilaturas Miel, S.L. v. Republic of Iraq,*
    573 F. Supp. 2d 781 (S.D.N.Y. 2008).............................................................12, 13, 14, 15

*Hollow v. Hollow,*
    193 Misc. 2d 691 (Sup. Ct. Oswego Co. 2002) .......................................................27 & n.6

*Livant v. Clifton,*
    334 F. Supp. 2d 321 (E.D.N.Y. 2004) ................................................................................20

*Mullane v. Cent. Hannover Bank & Trust Co.*,
   339 U.S. 306 (1950)..........................................................................................21

*Oss Nokalva, Inc. v. European Space Agency*,
   617 F.3d 756 (3d Cir. 2010)........................................................................10, 11

*Philip Morris USA Inc. v. Veles Ltd.*,
   No. 06-cv-2988 (GBD), 2007 U.S. Dist. LEXIS 19780
   (S.D.N.Y. Mar. 13, 2007) ...............................................................................22

*Prediction Co. v. Rajgarhia*,
   No. 09-cv-7459 (SAS), 2010 U.S. Dist. LEXIS 26536
   (Mar. 22, 2010) ...............................................................................................22

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992)...................................................................................12, 13

*S.E.C. v. Lines*,
   No. 07-cv-11387 (DLC), 2009 U.S. Dist. LEXIS 69855
   (S.D.N.Y. Aug. 7, 2009) .................................................................................22

*SCAC Transport Inc. v. S.S. "Danaos,"*
   578 F. Supp. 327 (S.D.N.Y. 1984) .................................................................24

*Shamsee v. Shamsee*,
   74 A.D.2d 357 (2d Dep't 1980).......................................................................23

*Smith v. Islamic Emirate of Afghanistan*,
   No. 01-cv-10132 (HB), 2001 U.S. Dist. LEXIS 21712
   (S.D.N.Y. Dec. 26, 2001)................................................................................22

*United States v. Machat*,
   No. 08-cv-973 (JGK), 2009 U.S. Dist. LEXIS 87000
   (S.D.N.Y. Sept. 21, 2009)...............................................................................22

**STATUTES**

22 U.S.C.
   § 288.................................................................................................................9
   § 288(a)(b) .....................................................................................................10

28 U.S.C.
   § 1330.............................................................................................................10
   § 1602.............................................................................................................10
   § 1603(d).........................................................................................................12
   § 1605(a)(2) ...................................................................................................10
   § 1608...................................................................................................23 & n.7

N.Y. C.P.L.R.
  § 308 (McKinney 2011)..................................................................................................27

**OTHER AUTHORITIES**

1990 United Nations Juridical Yearbook 257.......................................................14, 15

1999 United Nations Juridical Yearbook 418..............................................................14

Certain Expenses of the United Nations, International Court of Justice Advisory Opinion,
  2 I.C.J. 1962............................................................................................................8

Charter of the United Nations ...........................................................................5, 6, 7, 8

Convention on the Privileges and Immunities of the United Nations ................................. *passim*

Exec. Ord. No. 9698, 11 Fed. Reg. 1809 (Feb. 19, 1946) ...........................................10

Federal Rules of Civil Procedure
  Fed. R. Civ. P. 4(f)(3) .......................................................................................21, 26
  Fed. R. Civ. P. 4(j) ......................................................................................... 23 & n.7

General Assembly Resolution A/RES/22A(I)(D) (Feb. 13, 1946) .................................6

H.R. Rep. No. 94-1487, 16, 1976 U.S.C.C.A.N. 6604 (1976) ......................................13

Procedures in place for implementation of article VIII,
  section 29, of the Convention on the Privileges and
  Immunities of the United Nations, adopted by the
  General Assembly on 13 February 1946,
  Apr. 24, 1995, UN Document A/C.5/49/65 .....................................................17, 23

*UNESCO v. Boulois*, Cour d'Appel, Paris, June 19, 1998, 1999 Yearbook Commercial
  Arbitration (Kluwer) 294 ...............................................................................15, 16

## INTRODUCTION

By Order dated March 18, 2011, Your Honor directed Plaintiff to address the following three issues by April 18, 2011:

    1. Whether the United Nations Development Programme ("UNDP") enjoys immunity from suit;

    2. Service on UNDP; and

    3. Whether UNDP is a separate juridicial entity.

These issues are discussed below, after a brief summary of the relevant facts in the Complaint. In sum, the UNDP is not immune from suit in connection with the commercial claims at issue in this case. Service on the UNDP has been effected. The UNDP should be ordered to appear at the next conference in this case to explain its position. In the alternative, it is respectfully requested that alternative service be ordered. Finally, the UNDP is a juridicial entity capable of suing and being sued.

## BACKGROUND

Tuzla Tersanecilik ve Turizm A.S. ("Tuzla") is a commercial business headquartered in the Tuzla suburb of Istanbul, Turkey. Plaintiff Kahraman Sadikoglu ("Plaintiff") was the majority owner of Tuzla, and when he transferred his ownership interest in Tuzla, the right to pursue this claim was assigned to him.

Tuzla is a private entity that provides a number of services related to the dry docking and repair of ships. Dry docking is the process by which large, heavy ships are lifted out of water, using large cranes and other equipment. Dry docking is a complex and potentially dangerous process requiring specialized equipment and significant expertise. Tuzla's services are and were

at all relevant times available to any customers, including private parties, in need of Tuzla's dry docking or ship repair services.

In May 2003, UNDP engaged Tuzla to provide its services to remove certain wrecked ships from Umm-Qasr port in Iraq. (Complaint ("Comp."), ¶ 27.) Prior to that, Tuzla had entered into a wreck removal contract with the Iraqi government, as of January 14, 2001 (the "January 2001 Contract"). (Comp., ¶ 20, Exh. A.) Under the January 2001 Contract, Tuzla was engaged to remove wrecked ships that had been sunk in the Umm-Qasr Port during the first Gulf War in the early 1990s, and during the Iran-Iraq War in the 1980s. (Comp., ¶ 19.) Tuzla's work under the January 2001 Contract was brought to an end with the invasion of Iraq and removal of Saddam Hussein in March 2003. (Comp., ¶ 21.)

Subsequent to the removal of Saddam Hussein, UNDP asked Tuzla to continue the work it had begun under the January 2001 Contract, and to perform additional work not contemplated by the January 2001 Contract. (Comp., ¶¶ 23-25.) Specifically, UNDP asked Tuzla to remove ships from the water in Umm-Qasr port, and then to cut the ships into scrap metal, and store the scrap metal on jetties in the port so that another UNDP contractor could then sell the scrap metal on international markets and remit the profits to UNDP. (Comp., ¶¶ 25, 32.) The additional tasks of cutting the ships into scrap metal and storing and transmitting the scrap metal for sale were not included in Tuzla's earlier contract with the Saddam Hussein-led government of Iraq. (*Id.*) UNDP asked Tuzla to perform the additional services of cutting the ships into scrap metal and store the scrap metal because UNDP sought to sell the scrap metal and retain the profits. (*Id.*, ¶ 32.) The additional work of cutting the enormous ships into scrap metal was an extraordinary undertaking, requiring a great deal of extra work. (Comp., ¶ 33 and Exh. E.)

In addition to the services related to UNDP's intended sale of scrap metal, Tuzla's contract with UNDP also required Tuzla to procure and deploy costly anti-pollution equipment to control pollution flowing from old ships in the Umm Qasr Port. (Comp., ¶ 31.)  UNDP directed Tuzla to bill UNDP for this work. (*Id.*)  UNDP also directed Tuzla to lift one ship, the Mendilli, three times rather than once because Iraqi saboteurs and thieves had sunk the ship after it had already been lifted. (*Id.*, ¶ 34.)  These services were not included under the earlier contract with the Government of Iraq. (*Id.,* ¶ 31.)

Under the contract between UNDP and Tuzla, UNDP made it clear that payments for Tuzla's work would "come directly from UNDP New York" and "[a]ll the funds required for the above project(s) are in the hands of UNDP" (Comp., ¶ 27, Ex. B) (emphases added).  UNDP also made it clear that the contract was with UNDP "under the control, management and implementation of UNDP," including "Mr. Michel Gautier (Chief Iraq Unit New York)." (*Id.*)  UNDP emphasized that "UNDP are in full control of the wreck removal project(s)" and that any questions or concerns about Tuzla's performance under the contract should be addressed not to "the new Iraqi Government" but to "UNDP New York." (*Id.*)  On September 17, 2003, UNDP confirmed its contract "[w]ith effect from 10th June 2003 . . . for the implementation of extra works with Mr. Kahraman Sadikoğlu." (Comp., ¶ 28, Ex. C) (emphases added).  Thus, UNDP contracted with Tuzla (through Mr. Sadikoğlu) and agreed that Tuzla would perform services for UNDP, including the extra services not included under the January 2001 Contract with the Government of Iraq, and that Tuzla would be paid from UNDP's headquarters in New York. (Comp., ¶ 29.)

Over the course of 2003 and 2004, Tuzla fully performed its obligations under its contract with UNDP, as acknowledged by UNDP representative John Curley. (*Id.*, ¶¶ 30, 35-

38.)  While Tuzla was in the process of performing its services, UNDP was eager for Tuzla to finish salvaging the ships and cutting them into scrap metal so that UNDP could profit.  (*Id.*, ¶¶ 25, 32, 39.)  However, perhaps losing interest after learning that the scrap metal from the wrecked ships was not saleable, UNDP never followed through on its promises and obligations to pay Tuzla for its services even though it was well-aware of its contractual duties. (*Id.*, ¶¶ 40, 42.)  Indeed, in a letter dated September 5, 2005, UNDP representative John Curley stated:

> UNDP misused this company during some of the most difficult and extraordinary times that I have ever experienced.  So with all of the above in mind, I would like confirm that as the ex-salvage manager for UNDP wreck removal project Iraq, I confirm that all the outstanding works in question and rightly claimed by Tuzla salvage is absolutely correct and I will sign off, if required, any UNDP documentation.

(*Id.*, ¶ 57, Ex. M, at 3.)  After delaying payment to Tuzla repeatedly, in 2006 UNDP made the astonishing claim, in direct contradiction to its own documents, that it never had a contract with Tuzla, nor did it have the authority or funds to do so.  (*Id.*, ¶¶ 40-49.)

Despite UNDP's adamant statements in late 2006 that it never had a contract with Tuzla, UNDP proposed in November 2007 to arbitrate Tuzla's claims for compensation from UNDP (*See generally* Letter from Lawrence W. Newman, Esq. to George G. Irving, Esq., dated November 2, 2007, attached hereto as Exhibit "1." )  Specifically, UNDP proposed an arbitration with three arbitrators in New York under UNCITRAL rules.  (*See id.* at 2.)  UNDP's proposal acknowledged that the claims concerned services not covered under Tuzla's January 2001 contract with the Government of Iraq, including "[t]he claim for compensation for the alleged two additional liftings of the Mendilli;" "[t]he claim for compensation for additional anti-pollution equipment;" and "[t]he claim for compensation for cutting of the scrap by Tuzla." (*Id.*)

UNDP later, however, changed its mind about honoring its contractual obligations yet again, and ultimately refused to arbitrate.

Although UNDP acknowledges that Tuzla completed its obligations under the contract and that Tuzla has not been paid for those services, and although UNDP does not contest the authenticity of the documents recording the parties' contract, UNDP nevertheless refuses to pay Tuzla for its services.  Plaintiff has tirelessly pursued commercial arbitration with UNDP pursuant to UNDP's customary practices.  Most recently, Plaintiff proposed to arbitrate the claims in this case pursuant to UNDP's own recommended arbitration clause.  (*See* Letter from Robert Sentner to Stephen Mathias, dated April 6, 2011, attached hereto as Exhibit "2.")

UNDP, yet again, has not seen fit to even respond to this letter.  UNDP's conduct leaves Plaintiff with no available forum – for resolution of disputes involving a contract for purely commercial services performed by a private actor – other than this Court.

## LEGAL ARGUMENT

### I.    UNDP IS NOT IMMUNE WITH RESPECT TO THE CLAIMS AT ISSUE IN THIS DISPUTE.

UNDP, despite its status as an agency of the United Nations, is not immune from disputes arising from commercial contracts entered into by UNDP.

### A.    The Immunity Conferred upon the United Nations and Its Agencies Is a Functional Immunity Pursuant to Articles 103 and 105 of the Charter of the United Nations.

The Charter of the United Nations, signed on June 26, 1945, (the "Charter") (attached hereto as Exhibit "3") provides in Article 105 that the United Nations shall have a functional immunity:

> The Organization shall enjoy in the territory of each of its
> Members such privileges and immunities as are necessary for the
> fulfilment of its purposes.

*Id.* at 19 (emphasis added).  The Convention on the Privileges and Immunities of the United

Nations, adopted by the General Assembly of the United Nations on February 13, 1946 (the

"1946 Convention") (attached hereto as Exhibit "4")[1] and acceded to by the United States on

April 29, 1970, addresses the functional immunity granted by Article 105 of the 1946

Convention, as well as the functional legal capacity granted by Article 104 of the Convention.[2]

The 1946 Convention does not and cannot supersede, expand, or alter in any way the immunities

granted by the Charter.  Pursuant to Article 103 of the Charter, no treaty signed subsequent to the

Charter, including the 1946 and 1947 Conventions, may be interpreted in a manner that conflicts

with the Charter:

> In the event of a conflict between the obligations of the Members
> of the United Nations under the present Charter and their
> obligations under any other international agreement, their
> obligations under the present Charter shall prevail.

---

[1]   On November 21, 1947 the General Assembly of the United Nations also approved the Convention
on the Privileges and Immunities of the Specialized Agencies (the "1947 Convention"), addressing
the privileges and immunities available to the specialized agencies of the United Nations under
Article 105 of the Charter and the 1946 Convention.  Article III, Section 4 of the 1947 Convention
corresponds to Article II, Section 2 of the 1946 Convention, and Article IX, Section 31 of the 1947
Convention corresponds to Article VIII, Section 29 of the 1946 Convention.

[2]   The Preamble to the 1946 Convention provides:

*Whereas* Article 104 of the Charter of the United Nations provides that the Organization shall
enjoy in the territory of each of its Members such legal capacity as may be necessary for the exercice
of its functions and the fulfilment of its purposes and

*Whereas* Article 105 of the Charter of the United Nations provides that the Organization shall
enjoy in the territory of each of its Members such privileges and immunities as are necessary for the
fulfillment of its purposes and that representatives of the Members of the United Nations and
officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for
the independent exercise of their functions in connection with the Organization;

*Consequently* the General Assembly by a Resolution adopted on the 13 February 1946, approved
the following Convention and proposed it for accession by each Member of the United Nations.

(Ex. 3 at 19.) *See also* General Assembly Resolution A/RES/22A(I)(D) (Feb. 13, 1946),

Privileges and Immunities of the United Nations: Report of the Sixth Committee: Resolutions

(attached hereto as Exhibit "5"), at 452 ("It is important that in setting up this great new

international Organization we should not ask for it to possess privileges and immunities greater

than those required for its efficient organization."). Thus, Article II, Section 2 of the Convention

does not and cannot grant immunities broader than the functional immunities provided for in

Article 105 of the Charter. Rather, Article II, Section 2 of the Convention[3] merely substantiates

the functional immunity provided for in Article 105.

Various provisions of the Convention itself acknowledge the functional nature of the

immunity granted to the United Nations. For instance, Article VIII, Section 29(a) acknowledges

that the United Nations is ***not*** immune to "disputes arising out of contracts or other disputes of a

private law character to which the United Nations is a character." That Section provides that

"[t]he United Nations shall make provisions for appropriate modes of settlement of" such

disputes. In addition, various provisions regarding the privileges and immunities accorded to

United Nations officials and experts and Members' representatives to the United Nations make it

clear that such privileges and immunities are functional immunities.[4]

---

[3]     Article II, Section 2 of the Convention provides:

The United Nations, its property and assets wherever located and by whomsoever held, shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity. It is, however, understood that no waiver of immunity shall extend to any measure of execution.

[4]     *See* Article IV, Section 11 (Member representatives accorded privileges and immunities "while exercising their functions and during their journey to and from the place of meeting"); Article IV, Section 14 ("Privileges and immunities are accorded to the representatives of Members not for the personal benefit of the individuals themselves, but in order to safeguard the independent exercise of their functions in connection with the United Nations."); Article V, Section 20 ("Privileges and immunities are granted to officials in the interests of the United Nations and not of the personal benefit of the individuals
*(Footnote continued on next page)*

Thus, pursuant to Articles 103 and 105 of the United Nations Charter, the immunities of the United Nations and its agencies are restricted and functional in nature, and not absolute. *See also* Certain Expenses of the United Nations, International Court of Justice Advisory Opinion, 2 I.C.J. 1962 (attached hereto as Exhibit "6"), at 168 (the purposes of the United Nations "are broad indeed, but neither they nor the powers conferred to effectuate them are unlimited."). Even if the Convention on Privileges and Immunities provided for absolute immunity (which is not does not), such language would be null because no subsequent treaty may supersede the Charter.

B.   The Privileges and Immunities of UNDP Do Not Extend to Its Involvement in Commercial Activities.

The functional immunity extended to international organizations such as the United Nations is granted so that they can carry out their missions and undertake activities that traditionally only a sovereign would be able to perform. *See, e.g., Askir v. Boutros-Ghali*, 933 F. Supp. 368, 372 (S.D.N.Y. 1996) (United Nations immune from suit in case concerning military occupation of plaintiff's property because "military operations are a distinctive province of sovereigns and governments"); *Boimah v. United Nations Gen. Assembly*, 664 F. Supp. 69, 71 (E.D.N.Y. 1987) ("an international organization's self-regulation of its employment practices is an activity essential to the 'fulfillment of its purposes' and thus an area to which immunity must

---

*(Footnote continued from previous page)*
themselves."); Article V, Section 21 ("The United Nations shall cooperate at all times with the appropriate authorities of Members to facilitate the proper administration of justice, secure the observance of police regulations and prevent the occurrence of any abuse in connection with the privileges, immunities and facilities mentioned in this article."); Article VI, Section 22 (experts performing missions for the United Nations shall be accorded "such privileges and immunities as are necessary for the independent exercise of their functions during the period of their missions, including the time spent on journeys in connection with their missions."); Article VI, Section 23 ("Privileges and immunities are granted to experts in the interests of the United Nations and not for the personal benefit of the individuals themselves.").

extend."). Put another away, the immunity granted to international organizations is only the immunity necessary to carry out their functions. This immunity does not extend to private contracts or other activities not inherently linked to an international organization's functions. It is not essential to the functioning of international organizations that they be permitted to break commercial contracts with private actors with impunity. The 1946 Convention acknowledges this, both by reference to the functional immunity granted under Article 103 of the Charter (*see* Point I.A, *supra*), and in Article VIII, Section 29, providing that the United Nations *shall* make appropriate provisions for settlement of "disputes arising out of contracts or other disputes of a private law character to which the United Nations is a character."

The United Nations has long acknowledged that its immunity does not extend to its involvement in commercial activities, including contracts with commercial enterprises. The United Nations has long engaged in arbitration to resolve disputes arising from private contracts. In 1995, this practice was reinforced by the Report of the Secretary General, "Procedures in place for implementation of article VIII, section 29, of the Convention on the Privileges and Immunities of the United Nations, adopted by the General Assembly on 13 February 1946," Apr. 24, 1995, UN Document A/C.5/49/65 (the "1995 Report") (attached hereto as Exhibit "7"). The 1995 Report acknowledges that it has been the practice of the United Nations and its agencies, including UNDP, "to make provision in its commercial agreements (contracts and lease agreements) for recourse to arbitration in the event of disputes that cannot be settled by direct negotiations." *Id.*, at II(A)(3). The 1995 Report further provides that even where a commercial agreement does not contain an arbitration clause, "the United Nations has agreed to submit the dispute to arbitration through the formulation of a compromis, which is, in effect, an agreement of the parties to insert an arbitration clause into the contractual relationship; the terms of the

compromis are agreed to after the initial contract has been concluded." *Id.*, at II(8) (emphases in original).  Here, however, UNDP has refused to submit to arbitration and the only recourse available to Plaintiff is the jurisdiction of domestic courts.

      C.     <u>This Court Has Subject Matter Jurisdiction Pursuant to the IOIA and FSIA.</u>

      This Court has jurisdiction over UNDP in this case pursuant to the International Organizations Immunity Act ("IOIA"), 22 U.S.C. § 288 *et seq.*  Enacted in 1945, the IOIA provides that organizations designated as "international organizations":

> Enjoy *the same immunity* from suit and every form of judicial process *as is enjoyed by foreign governments*, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.

22 U.S.C. § 288(a)(b) (emphases added).  The President designated the United Nations as an international organization subject to the IOIA by Executive Order dated February 19, 1946.  *See* Exec. Ord. No. 9698, 11 Fed. Reg. 1809 (Feb. 19, 1946).   The Foreign Sovereign Immunity Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602, *et seq.* codified the immunity extended to foreign sovereigns.  Under the FSIA, foreign governments are immune from the jurisdiction of United States courts, except in specific circumstances, including those:

> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or *upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States*.

28 U.S.C. § 1605(a)(2) (emphasis added).  Pursuant to "[w]ell-established rules of statutory interpretation," the immunity of international organizations is identical to the restrictive immunity described in the FSIA. *Oss Nokalva, Inc. v. European Space Agency*, 617 F.3d 756,

762-63 (3d Cir. 2010).  The IOIA is a "reference statute."  *Id.* at 763.  It is a well-established

principle of statutory interpretation that a reference statute adopts the law on the relevant subject

at the time of the enactment of the reference statute, and then includes all amendments and

modifications to the law subsequent to the enactment.  *Id.* (citations omitted).  As the Third

Circuit Court of Appeals has recognized, to confer broader immunity upon international

organizations than foreign governments would lead to "an anomalous result":

> We find no compelling reason why a group of states acting through
> an international organization is entitled to broader immunity than
> its member states enjoy when acting alone.  Indeed, such a policy
> may create an incentive for foreign governments to evade legal
> obligations by acting through international organizations.

*Id.* at 764.  Thus, the immunity of international organizations such as the United Nations is

restrictive, and not absolute, under the law of the United States.

Further, the United Nations is not entitled to any special exemptions or immunities

beyond those provided for in the IOIA and FSIA.  Had that been Congress or the President's

intent when the United Nations was designated as subject to the IOIA, they clearly could have

made a special provision for the United Nations.  To confer upon the United Nations "broader

immunity than its member states enjoy when acting alone" and broader immunity than other

international organizations would merely "create an incentive for foreign governments to evade

legal obligations by acting through" the United Nations.  It was hardly the intention of Congress

in drafting the IOIA and FSIA, or the member states in signing the Charter, to create a means to

use the organization to conceal wrongdoing and avoid liability.  But that is precisely what a

finding that the United Nations, unlike all foreign sovereigns and all other international

organizations, is entitled to absolute immunity, would do.

As a vast and sprawling organization that has been hit with large scale corruption

scandals in recent years, it is imperative that the United Nations not be permitted to escape

justice.  No foreign sovereign or international organization is immune from the jurisdiction of United States courts in cases concerning "commercial activity," and that includes the United Nations.

To the extent that United States courts have held that they did not have jurisdiction over the United Nations, those cases are distinguishable.  Such cases generally involve claims made by United Nations employees who were dissatisfied with the relief afforded them by the United Nations' internal system for adjudicating employment-related claims.  Courts have determined that matters concerning the United Nations' own employees do not concern "commercial activity" and are covered by the United Nations' immunity because they relate to the United Nations' core functions.  *See, e.g., Brzak v. United Nations,* 597 F.3d 107, 112-13 (2d Cir. 2010) (employment sex discrimination case, in which court specifically stated it need not determine whether IOIA limited immunity applied and that commercial activity was not involved); *Bisson v. United Nations*, No. 06-cv-6352 (PAC) (AJP), 2007 U.S. Dist. LEXIS 54334, at *41-42 (S.D.N.Y. July 27, 2007) (plaintiff had access to monetary compensation and remedies from the United Nations similar to those used under state Worker's Compensation programs); *Broadbent v. Org. of Am. States*, 628 F.2d 27, 30-33 (D.C. Cir. 1980) (court did not reach question of whether immunity was restrictive because even if restrictive immunity applied, employment was not a commercial activity).. *See also Askir*, *supra*,  933 F. Supp. at 372-73 (where case concerned "the operation of a military logistics and supply base," "even if there is an exception to the immunity provided by article 2 of the U.N. Convention based on a distinction between commercial and non-commercial activity . . . the activities upon which this lawsuit is based are not commercial").  Research has revealed no case in which a Court has held that it does not have

jurisdiction over the United Nations over disputes arising out of commercial activity, or that the

United Nations has immunity with respect to such commercial activities.

      1.      Commercial Activity

      Whether a particular activity or transaction is commercial "is determined by reference to

the nature of the activity, not its purpose." *Hilaturas Miel, S.L. v. Republic of Iraq*, 573 F. Supp.

2d 781, 793 (S.D.N.Y. 2008) (citing 28 U.S.C. § 1603(d)).  Under the FSIA, "[a]n activity is

commercial if it is the type of action by which a private party engages in trade and traffic or

commerce." *Id.* at 793-94 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614

(1992)).  Where an activity "was a commercial transaction with a private party," it does not

matter that the contract was with a foreign sovereign or international organization.  *Id.* at 795.

*See also* H.R. Rep. No. 94-1487, 16, 1976 U.S.C.C.A.N. 6604, 6615 (1976) ("[A] transaction to

obtain goods or services from private parties would not lose its otherwise commercial character

because it was entered into in connection with AID [Agency for International Development]

program.") (quoted in *Hilaturas*, 573 Supp. 2d at 794).  Here, UNDP contracted with Plaintiff, a

private party engaged in commercial business, to provide its services.  The fact that the United

Nations is an international organization does not take that contract outside the reach of

jurisdiction of the courts of the United States.  *See Hilaturas*, 573 F. Supp. 2d at 794 (holding

subject matter jurisdiction existed over contract to sell yarn to the Government of Iraq under

U.N. Oil for Food Program).

      2.      Direct Effect in the United States

      An effect is considered to be "direct" for the purposes of IOIA and FSIA if it "follows as

an immediate consequence of the defendant's . . . activity." *Weltover*, 504 U.S. at 618 (internal

quotations and citations omitted).  The "direct effect" need not be with respect to Plaintiff.

*Hilaturas*, 573 F. Supp. 2d at 795 (finding direct effect where payment under contract was to be made pursuant to letter of credit issued by New York bank).

UNDP, an agency domiciled in New York, New York, entered into a contract with Plaintiff. (*See* Comp., ¶¶ 14, 18, 27, 28, Exs. B and C.)  UNDP promised to pay Plaintiff for services performed under that contract by payments from UNDP's headquarters in New York, and represented that the funds were held in New York.  (Comp., ¶¶ 27, 28, Exs. B and C.) Indeed, Plaintiff was specifically instructed in a June 15, 2003 letter from UNDP that concerns should be brought to the attention of "UNDP New York." (Comp., Ex. B.)  Although Tuzla performed all of its obligations under the parties' contract, UNDP refused to pay for the services as promised from its New York bank accounts.  Thus, UNDP wrongfully retained payments for services rendered.  Because UNDP is domiciled in New York, UNDP personnel in New York were directly involved in the events giving rise to this dispute, and because the wrongfully withheld payments were, under the terms of the parties' contract, to be made from New York, the commercial activity here had a direct effect in the United States. *See Hilaturas*, 573 F. Supp. 2d at 795.  By contracting with Tuzla and then refusing to pay, UNDP has been unjustly enriched.

     D.     <u>In Any Event, the Commercial Activities Involved in This Dispute Are Outside the Legitimate Functions of UNDP and, Therefore, Are Not Subject to UNDP's Privileges and Immunities.</u>

The United Nations Office of Legal Affairs ("OLA") has acknowledged that participation in commercial activities could strip the United Nations and its agencies of their immunity before domestic courts. *See* 1990 United Nations Juridical Yearbook, at 257-58 (the "1990 OLA Opinion") (attached hereto as Exhibit "8").  In the 1990 OLA Opinion, the OLA states that if the United Nations "were to participate in a commercial joint venture, it would . . . have to waive its privileges and immunities, the granting of which would no longer be justified." *Id.*  The OLA

stressed that the UN could not enter into such a commercial arrangement "*even if the revenue derived by the United Nations from the project is to be devoted to United Nations programmes.*" *Id.* (emphasis added).  OLA again confirmed that the United Nations' immunity does not extend to commercial activities in an opinion, "Participation of Organizations of the United Nations System in Competitive Bidding Exercises Conducted by Governments," United Nations General Legal Division of the Office of Legal Affairs, 1999 United Nations Juridical Yearbook 418 (attached hereto as Exhibit "9").  In that opinion, the OLA stated "If the practice of United Nations system organizations competing with private companies for business were to be pursued, it cannot be a priori excluded that the immunity of such organizations might be challenged in court."

Here, the commercial activities at issue were outside UNDP's official functions and, therefore, not protected by its immunities.  In this case, UNDP engaged Plaintiff, hoping to profit from the sale of scrap metal.  (Comp., ¶¶ 25, 42, 49.)  Such an activity, with UNDP engaging in activities to sell scrap metal in the marketplace in competition with private actors, is clearly outside the charter and necessary functions of the United Nations and UNDP, even if the revenue derived from the sale of the scrap metal were to be put back into UN programs.  *See* Ex. 8; *see also Hilaturas*, *supra*, 573 F. Supp. 2d at 794 ("The commercial character of a course of activity or particular transaction is determined by reference to the nature of the activity, not its purpose.").

E.    If Jurisdiction is Not Exercised, Plaintiff Will Have No Forum Available to Resolve His Contract Dispute with UNDP, Resulting in a Fundamental Denial of Justice.

Jurisdiction must be exercised in this case because otherwise, no forum whatsoever will be available to Plaintiff regarding Tuzla's contract dispute with UNDP.  This would lead to a fundamental denial of justice.  Importantly, in all other contract cases (which were in fact

employment cases) in which United States courts have determined whether jurisdiction was available, the court noted that the Plaintiff had access to an appropriate forum via the United Nations' internal administrative forum for employment claims.  Under the basic principle of international law, *pacta sunt servanda* ("agreements must be kept"), UNDP cannot enter into contracts and then escape all jurisdiction.  It must be held accountable for its contracts.  The Court of Appeals of Paris reached exactly that conclusion in 1998, in the case *UNESCO v. Boulois*, Cour d'Appel, Paris, June 19, 1998, 1999 Yearbook Commercial Arbitration (Kluwer) 294-95 (attached hereto as Exhibit "10").

In *UNESCO v. Boulois*, the United Nations agency UNESCO (United Nations Education, Scientific and Cultural Organization) had entered into a contract with a Mr. Boulois.  *Id.* at 294. A dispute arose under the contract and pursuant to the arbitration clause in the parties' contract, Mr. Boulois commenced arbitration.  *Id.*  Mr. Boulois obtained an order in summary proceedings from the Paris Court of First Instance directing UNESCO to appoint an arbitrator.  *Id.*  UNESCO appealed the court's decision, insisting that there was no dispute and that in any event UNESCO was immune from jurisdiction.  *Id.*  UNESCO argued that it had not waived its immunity by agreeing to an arbitration clause in its contract with Mr. Boulois.  *Id.*  The Paris Court of Appeals held that the immunity granted to UNESCO "cannot allow it to escape from the principle of *pacta sunt servanda.*" *Id.*  The court also noted that UNESCO's argument, that there was no dispute, was solely a question for the arbitrators to consider and UNESCO could not refuse to arbitrate on that ground.  *Id.*  The court also held that to grant UNESCO's request would leave Mr. Boulois without a forum in which to bring his contract claim, which "would be contrary to public policy as it constitutes a denial of justice." *Id.*  Thus, the court exercised jurisdiction over

UNESCO, over its protests that it was entitled to absolute immunity as a United Nations agency, and required UNESCO to submit to arbitration as provided for in its contract.

Here, UNDP has refused to submit to arbitration to resolve Plaintiff's contract claims. And now UNDP refuses to even appear before this Court.  To allow UNDP to escape jurisdiction completely would constitute a fundamental denial of justice and violate the principle of *pacta sunt servanda*.  UNDP must be held accountable under its contracts.  Its status as an agency of an international organization does not exclude it from its obligation to pay for services contracted for and rendered.

## II.   UNDP HAS BEEN PROPERLY SERVED IN THIS ACTION.

Although UNDP has refused to appear in this action and repeatedly sought to avoid service, UNDP has been properly served the Summons and Complaint.  All requirements of notice and due process have been satisfied, and UNDP is well aware of this lawsuit and its concomitant obligations.  In the event the Court determines that additional service is required, Plaintiff respectfully requests that the Court issue an Order pursuant to *Fed. R. Civ. P.* 4(f)(3) specifying what further service should be made.

### A.   Plaintiff's Counsel Has Repeatedly Sought to Serve UNDP and Confer with Counsel for UNDP.

Plaintiff's counsel initially sought UNDP's agreement to be served voluntarily.  When that failed, it caused UNDP to be served by hand and certified mail on numerous UN officers.

*First*, the Summons and Complaint were hand delivered to UNDP's counsel, Lawrence Newman, Esq. of Baker & McKenzie LLP ("Baker & McKenzie"),[5] on January 14, 2011, the same day it was filed with this Court.

---

[5]   *See* Ex. 1.

*Second*, on February 15, 2011, Plaintiff's counsel telephoned and left a voicemail concerning this matter for Stephen Mathias, Esq., Assistant Secretary-General for Legal Affairs for the United Nations, who had corresponded directly with Plaintiff's counsel concerning this matter in August 2010.  To date, Mr. Mathias has not returned the call of Plaintiff's counsel or otherwise acknowledged the February 15th voicemail.

*Third*, on February 24, 2011, Plaintiff's counsel sent copies of the Summons, Complaint and Order to Mr. Mathias by email, along with a request for a conference.  To date, Mr. Mathias has not responded to or otherwise acknowledge the February 24th email and receipt of the Summons, Complaint, and Order.

*Fourth*, on February 28, 2011, Plaintiff's counsel contacted Mr. Newman of Baker & McKenzie both by email and by letter, informing Mr. Newman of the Court's Order and requesting a conference.  Mr. Newman replied in a letter dated March 3, 2011, stating that he was unable to accept service of the Summons and Complaint and not authorized to discuss the matter with Plaintiff's counsel.  Mr. Newman advised Plaintiff's counsel to direct any future correspondence regarding this matter to the United States Mission to the United Nations.

*Fifth*, on March 8, 2011, in accordance with Mr. Newman's March 3, 2011 letter, copies of the Summons, Complaint, and Order were served on the United States Mission to the United Nations, and service was accepted.  (*See* Affidavit of Service of Yancy Fleetwood, dated March 16, 2011 (attached hereto as Exhibit "11").  To date, neither UNDP nor its counsel have contacted Plaintiff's counsel regarding this action or otherwise acknowledged service on the United States Mission to the United Nations.

*Sixth*, as it was apparent that UNDP would not accept service voluntarily, on March 22-23, 2011, attempts were made to serve various officers of UNDP and the Office of Legal Affairs

of its parent body the United Nations.  On March 22, 2011, service was attempted by hand

delivery at the United Nations headquarters 760 United Nations Plaza, New York, New York, on

1) Stephen Mathias, Assistant Secretary-General for Legal Affairs; 2) Patricia O'Brien, Under-

Secretary General for Legal Affairs and United Nations Legal Counsel; and 3) Antigoni

Axenidou, Deputy Director of the General Legal Division of the Office of Legal Affairs.  The

process server was told that the aforementioned officers were unavailable to accept service.  The

process server returned on March 23, 2011 and was threatened by security personnel that if he

left the service papers anywhere within the vicinity of United Nations headquarters he would be

arrested.  (*See* Affidavits of Attempted Delivery of Otis Osborne, dated March 25, 2011

(attached hereto as Exhibit "12").)

 *Seventh*, also on March 22-23, 2011, service was attempted on 1) Helen Clark, UNDP

Administrator; and 2) Rebecca Grynspan, UNDP Associate Administrator, at One United

Nations Plaza, New York, New York.  On March 22, 2011, the process server was told by

security that they would not cooperate or allow service of process at that address.  The process

server returned on March 23, 2011 and this time was instructed to leave the documents with a

security employee who refused to give the process server his name.  (*See* Affidavits of Service of

Otis Osborne, dated March 25, 2011(attached hereto as Exhibit "13").

 *Eighth*, also on March 22-23, 2011 service was attempted by hand delivery to the Deputy

Director of Investigations at the Office of Audit and Investigations [of the United Nations]

located at 220 East 42nd Street, New York, New York.  Security personnel refused to accept

service on March 22, 2011.  The process server returned on March 23, 2011 and was instructed

to leave the documents with an employee in the mailroom named A. Torres.  (*See* Affidavit of

Service of Otis Osborne, dated March 25, 2011 (attached hereto as Exhibit "14").

*Ninth*, each of the aforementioned individuals *to wit* -- 1) Stephen Mathias, Assistant Secretary-General for Legal Affairs; 2) Patricia O'Brien, Under-Secretary General for Legal Affairs and United Nations Legal Counsel; 3) Antigoni Axenidou, Deputy Director of the General Legal Division of the Office of Legal Affairs;  4 Helen Clark, UNDP Administrator; 5) Rebecca Grynspan, UNDP Associate Administrator. and 6) the Deputy Director of Investigations at the Office of Audit and Investigations [of the United Nations], was also served by certified mail on March 22, 2011. (*See* Affidavit of Service of Yancy Fleetwood, dated April 4, 2011 (attached hereto as Exhibit "15").)

     B.     <u>The Methods of Service Employed by Plaintiff's Counsel Satisfy All Legal Requirements.</u>

Hand delivery and certified mail are proper methods of service upon UNDP, as evidenced by the fact that service has previously been effected by those means in actions against the United Nations and/or its agencies in this jurisdiction.  For instance, in *Brzak v. United Nations*, 551 F. Supp. 2d 313 (S.D.N.Y. 2008), the plaintiff effected service on Kofi Annan, Secretary-General of the United Nations, and the United Nations by sending the Summons and Complaint by certified mail to One United Nations Plaza, New York, New York. *See id.*, Affidavits of Service, Dkt. Nos. 4, 5, 6, 10,12 (attached hereto as Exhibit "16").

In *Bisson v. United Nations*, *supra*, the plaintiff effected service by hand delivery to Vivian Villanueva, Managing Clerk, in the lobby of 2 United Nations Plaza, BLDG 2, New York, New York, and by certified mail to the United Nations Legal Division at the Secretariat Building at East 42nd St and 1st Ave, New York, New York. *See id.*, Dkt. No. 2 (attached hereto as Exhibit "17"). The process server in that case had been instructed that he was not permitted to serve the documents personally and was instead required to serve the documents by certified mail to the attention of the United Nations Legal Division. *Id.*

And in *DeLuca v. United Nations*, 841 F. Supp. 531 (S.D.N.Y. 1994), the plaintiff effected service by certified mail to Anthony J. Miller Esq., Principal Legal Office and Carl-August Fleischhauer Esq., Under-Secretary General of Legal Affairs, at 405 East 42nd Street, New York, NY (the Secretariat Building). *Id.*, Dkt. No. 4 (attached hereto as Exhibit "18").

Service by certified mail meets the requirements of due process, even where such mail is returned unclaimed. *Livant v. Clifton*, 334 F. Supp. 2d 321, 326 (E.D.N.Y. 2004) (holding "notice by way of a certified letter to Plaintiff's home address, even though returned unclaimed, was sufficient under the Due Process Clause to apprise Plaintiff of [notice]."). As the court noted in *Livant*:

> It cannot be disputed that the use of certified mail to convey notice of … proceedings generally fits within the bounds of the process due to a litigant or prospective litigant. The courts have repeatedly upheld even the use of regular, first-class mail as constitutionally adequate means of service. Nor do we find a basis for an exception to this rule in the instant case merely because the notice was returned unclaimed.

*Id.* (citing *Fuentes-Argueta v. INS*, 101 F.3d 867 (2d Cir. 1996)).

Furthermore, the well-established *Mullane* service test asks not whether notice was actually received, but rather whether the means selected were such as one desirous of actually informing the absentee might reasonably adapt to accomplish it. *Livant*, 334 F.Supp.2d at 325 (citing *Mullane v. Cent. Hannover Bank & Trust Co.*, 339 U.S. 306, 315 (1950)). As long as a method of service was "reasonably calculated" to "apprise interested parties of the pendency of the action," service is effective. *Id.* It is simply not plausible that UNDP is not aware of this litigation, given the many attempts to serve UNDP in this action, as detailed above. Plaintiff's counsel has not only met the requirements of notice and due process, but exceeded them. Service has been made by hand delivery and certified mail upon numerous agents and representatives,

and multiple emails have been sent and telephone calls placed in an effort to confer with UNDP or its counsel.  At this point, UNDP is certainly well aware of this action and the Court should find that service has been effectuated.

      C.     <u>Should the Court Find That Service Has Not Been Effectuated, The Court Should Tailor An Alternative Under Federal Rules of Civil Procedure ("FRCP") Rule 4(f)(3)</u>

In the event that the Court is not satisfied with Plaintiff's valiant efforts to effect service, Plaintiff respectfully requests that the Court provide guidance in tailoring a means of process that would constitute "effective service" under *Fed. R. Civ. P.* 4(f)(3).  Federal Rule of Civil Procedure 4(f)(3) provides that service may effected "by other means not prohibited by international agreement, as the court orders."

Granting permission for an alternative method of service is "neither a last resort nor extraordinary relief." *Chevron Corp. v. Donziger*, No. 11-cv-0691 (LAK), 2011 U.S. Dist. LEXIS 22729, at *130 (S.D.N.Y. Mar. 7, 2011) (internal quotations and citations omitted).  To be entitled to an alternative means of service pursuant to *Fed. R. Civ. P.* 4(f)(3), a plaintiff must show 1) that it has made a reasonable effort to effectuate service; and 2) that the facts and circumstances justify the court's intervention.  *Prediction Co. v. Rajgarhia*, No. 09-cv-7459 (SAS), 2010 U.S. Dist. LEXIS 26536, at *5 (Mar. 22, 2010) (permitting service of process by email where plaintiff was unable to obtain defendant's physical address); *see also United States v. Machat*, No. 08-cv-973 (JGK), 2009 U.S. Dist. LEXIS 87000, at *10 (S.D.N.Y. Sept. 21, 2009) (permitting service of process on defendant by email after several failed attempts by hand delivery); *S.E.C. v. Lines*, No. 07-cv-11387 (DLC), 2009 U.S. Dist. LEXIS 69855, at *4-6 (S.D.N.Y. Aug. 7, 2009) (same); *see also Smith v. Islamic Emirate of Afghanistan*, No. 01-cv-10132 (HB), 2001 U.S. Dist. LEXIS 21712, at *10-11 (S.D.N.Y. Dec. 26, 2001) (permitting service by publication).

An appropriate alternative method of service is one that is reasonably calculated to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Philip Morris USA Inc. v. Veles Ltd.*, No. 06-cv-2988 (GBD), 2007 U.S. Dist. LEXIS 19780, at *8-9 (S.D.N.Y. Mar. 13, 2007)(permitting service by fax and email); *see also Lines*, 2009 U.S. Dist. LEXIS 69855, at *5-6.[6]

To that end, should the Court find Plaintiff's notice and effect of service inadequate in any respect, Plaintiff requests that the Court grant permission to effect service by an alternative method, such as fax, publication, or email. Plaintiff will, for instance, publish the suit in the New York Times on consecutive days, if so directed.[7]

---

[6]    A parallel provision exists under New York Rules of Civil Procedure ("CPLR") § 308 which provides,

> Personal service upon a natural person shall be made:
>
> ....
>
> > (3) in such manner as **the court, upon motion with notice, directs**, if service is impracticable under paragraph one, two, and four of this section.

N.Y. CPLR § 308 (McKinney 2011) (emphasis added); *see also See D.R.I., Inc. v. Dennis*, No. 03-cv-10026 (PKL), 2004 U.S. Dist. LEXIS 22541, at *2 (S.D.N.Y. June 3, 2004) (allowing service of process through publication and email when defendant had moved from the residence without registering his new address or providing any forwarding address); *Hollow v. Hollow*, 193 Misc. 2d 691, 708 (Sup. Ct. Oswego Co. 2002), (holding service directed to defendant's last known email address sufficient to satisfy due process where plaintiff had already attempted service through international process server and defendant's employer).

[7]    If the Court chooses to treat UNDP as a "foreign state" and so requests, Plaintiff would be happy to comply and effect service on the defendants under Rule 4(j) of the Federal Rules of Civil Procedure, which states that "a foreign state or its political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C. § 1608."

Under Title 28, Section 1608, service on a foreign state shall be executed

> > (3) ... by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

> > (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services- and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

*(Footnote continued on next page)*

### III.    UNDP IS AN INDEPENDENT AND DISTINCT LEGAL ENTITY FULLY CAPABLE OF APPEARING IN THIS ACTION.

UNDP is a separate and independent legal entity with the capacity to enter into contracts and to bring and defend itself in lawsuits. UNDP is a "subsidiary body" and "separately administered organ" of the United Nations, and as such is amenable to suit in its own name. *See* Ex. 7; *see also Boimah*, *supra*, 664 F. Supp. at 71-72 (permitting plaintiff to proceed with suit against United Nations General Assembly, described as one of the six "principal organs" of the United Nations, without adding the United Nations as a party); *Shamsee v. Shamsee*, 74 A.D.2d 357 (2d Dep't 1980) (allowing suit to proceed against United Nations Joint Staff Pension Fund without adding United Nations as a party).

Indeed, UNDP has brought claims as a plaintiff in this jurisdiction. *See, e.g., SCAC Transport Inc. and United Nations Development Programme Office for Projects Execution v. S.S. "Danaos,"* 578 F. Supp. 327 (S.D.N.Y. 1984). As indicated above in Point I.E, it would be anomalous and a fundamental denial of justice to find that UNDP may avail itself of the jurisdiction of this Court when it wishes to bring an action as a plaintiff, but may at the same shield itself from this Court's jurisdiction in any case in which it would be a defendant.

During the course of this very dispute, UNDP has acted in its own independent legal capacity. In a letter dated November 2, 2007, UNDP, through counsel, proposed that UNDP, not the United Nations, would arbitrate these disputes, leaving no doubt that UNDP is an entity capable of engaging in legal proceedings on its own behalf. *See* Ex. 1 ("[w]e are prepared, *on behalf of UNDP*, to work out an agreement to arbitrate this matter.") (emphasis added).

---

*(Footnote continued from previous page)*
28 U.S.C. § 1608.

UNDP is the proper defendant in this suit, and has the capacity and resources to independently defend itself.  However, should the Court remain unconvinced for any reason, Plaintiff requests leave to amend the Complaint to add the United Nations as a party to the suit.

## CONCLUSION

Based on the foregoing, the Court should order that this litigation proceed, as the Court has jurisdiction over UNDP and this matter and UNDP has been properly served.  It is respectfully requested that the Court issue an order directing UNDP to appear at a conference scheduled by the Court to explain its position regarding the issues address in this memorandum. In the event that Court harbors doubt over the effectiveness of service, Plaintiff respectfully requests that the Court grant leave to effect service by an alternative method.  And in the event that the Court finds that UNDP is not an independent legal entity, Plaintiff respectfully requests leave to amend the Complaint to add the United Nations a defendant.

Dated: New York, New York
       April 18, 2011

                              Respectfully submitted,

                              /s/ Robert C. Sentner
                              Robert C. Sentner
                              Edward C. O'Callaghan
                              Amanda L. Devereux
                              Sherli Yeroushalmi
                              NIXON PEABODY LLP
                              437 Madison Avenue
                              New York, New York  10022
                              Tel.: (212) 940-3000
                              Fax: (212) 940-3111
                              rsentner@nixonpeabody.com

                              *Attorneys for Plaintiff*