UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KAHRAMAN SADIKOĞLU,

Plaintiff,

- vs -

UNITED NATIONS DEVELOPMENT PROGRAMME

Defendant.

No. 11-cv-0284 (PKC)

**PLAINTIFF'S MEMORANDUM IN RESPONSE TO THE UNITED STATES' STATEMENT OF INTEREST**

Robert C. Sentner
Edward C. O'Callaghan
Amanda L. Devereux
Sherli Yeroushalmi
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
(212) 940-3000

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

**Page**

Table of Authorities ..... ii

INTRODUCTION ..... 1

LEGAL ARGUMENT ..... 2

I. UNDP IS NOT IMMUNE FROM SUIT IN THE CONTEXT OF COMMERCIAL CONTRACTS ..... 2

A. The IOIA Grants Restrictive and Not Absolute Immunity to International Organizations ..... 2

B. Under the U.N. Charter, the U.N. Has Functional, not Absolute, Immunity, which Does Not Extend to Commercial Activity ..... 5

C. The Cases Relied Upon by the United States Are Highly Distinguishable from the Instant Case, which is a Matter of First Impression ..... 7

D. In *UNESCO v. Boulois*, the Court Exercised Jurisdiction over the U.N. to Enforce the Parties' Contract Requiring Arbitration ..... 9

E. Requiring UNDP to Take Responsibility for Its Contractual Obligations in the Instant Case Will Not Interfere with the Operation of UNDP ..... 11

CONCLUSION ..... 13

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Askir v. Boutros-Ghali*,
933 F. Supp. 368 (S.D.N.Y. 1996) ........................................ 8 n.10, 8 n.11

*Boimah v. United Nations Gen. Assembly*,
664 F. Supp. 69 (E.D.N.Y. 1987) ........................................ 8 n.9, 8 n.11, 12

*Broadbent v. Org. of Am. States*,
628 F.2d 27 (D.C. Cir. 1980) ........................................ 12

*Brzak v. United Nations*,
597 F.3d 107 (2d Cir. 2010), *cert. den'd*,
131 S. Ct. 151 (2010) ........................................ 2 n.1, 8, 8 n.11

*Cornejo v. County of San Diego*,
504 F.3d 853 (9th Cir. 2007) ........................................ 6 n.7

*De Luca v. United Nations Org.*,
841 F. Supp. 531 ........................................ 8 n.11

*Hunter v. United Nations*,
2004 N.Y. Slip. Op. 51751U (Sup. Ct. N.Y. Cty. 2004) ........................................ 8 n.11

*OSS Nokalva, Inc. v. European Space Agency*,
617 F.3d 756 (3d Cir. 2010) ........................................ 2, 3, 4, 9

*Shamsee v. Shamsee*,
74 A.D.2d 357 (2d Dep't 1980) ........................................ 8 n.11

*UNESCO v. Boulois*,
Cour d'Appel de Paris (June 19, 1998) ........................................ 9, 10, 11

**STATUTES**

28 U.S.C. § 1330 ........................................ 2, 3, 4, 5

28 U.S.C. § 1602 ........................................ 2, 3, 4, 5

222 U.S.C. § 228 ........................................ 2, 3, 4, 5

**OTHER AUTHORITIES**

Charter of the United Nations ........................................ 5, 6, 6 n. 6, 7

Convention on the Privileges and Immunities of the United Nations ........ *passim*

European Convention for the Protection of Human Rights and Fundamental Liberties, Art. 6(1) ........ 11, 11 n. 13

Handbook on the Legal Status, Privileges and Immunities of the United Nations, Notes on the Drafting of Articles 104 and 105 of the United Nations Charter (1952), U.N. Document ST/LEG/2 ........ 6, 7, 7 n.8

H.R. No. 1203 (1945) ........ 2, 3 n.3, 4

H.R. Rep. 105-802 (1998) ........ 4

H.R. Rep. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604 ........ 5 n.5

Letter from B. Owen, State Dept. Legal Adviser, to Leroy D. Clark, General Counsel, Equal Employment Opprtunity Commission (June 24, 1980), *reprinted in* Marian L. Nash, *Contemporary Practice of the United States Relating to International Law*, 74 AM J. INT'L L. 917, 917-18 (1980) ........ 3, 4

*Report of the Preliminary Commission of the United Nations*, Dec. 20, 1945, U.N. Document PC/20 ........ 6

*Report of the Secretary-General on procurement-related arbitration*, Oct. 14, 2011, U.N. Document A/54/458 ........ 12 n.14, 13 n. 15, 14 n. 16

Restatement (Third) of Foreign Relations Law of the United States § 325(1) ........ 6 n.7, 7

S. Rep. 861 (1945) ........ 3 n.3

## INTRODUCTION

Plaintiff submits this memorandum in response to the United States' July 6, 2011 Statement of Interest ("U.S. Stmt."), in accordance with the Court's July 7, 2011 Scheduling Order, and in further support of Plaintiff's April 18, 2011 memorandum ("Pl. Br.") regarding the lack of immunity for the defendant, the United Nations Development Programme ("UNDP"), in this matter.

As discussed below, and in Plaintiff's initial brief, the immunity afforded to UNDP is functional in nature and does not extend to its commercial contracts with private actors. The United States fails to demonstrate otherwise in its Statement of Interest. Moreover, the United States makes it clear that UNDP has an obligation under the Convention on the Privileges and Immunities of the United Nations (the "Convention") to provide an arbitral forum for this dispute. UNDP has refused to comply with that obligation, which has necessitated this action (which would be withdrawn if UNDP complied with its obligation). UNDP cannot both refuse to comply with its obligation to provide an arbitral forum for commercial disputes, and claim immunity from suit. In that respect, the United States has cited no case that has extended the U.N.'s immunity as far as it seeks to do here – total immunity for commercial disputes. No Court has afforded the U.N. such immunity. To the contrary, UNDP is not immune from the commercial breach of contract claims asserted in this action, and this case should proceed accordingly.

## LEGAL ARGUMENT

### I. UNDP IS NOT IMMUNE FROM SUIT IN THE CONTEXT OF COMMERCIAL CONTRACTS.

#### A. The IOIA Grants Restrictive and Not Absolute Immunity to International Organizations.

As discussed in the well-reasoned holding of the Third Circuit Court of Appeals,[1] the International Organizations Immunity Act (the "IOIA"), 222 U.S.C. § 288, *et seq.*, is a reference statute to be interpreted in conjunction with the Foreign Sovereign Immunities Act of 1976 (the "FSIA"), 28 U.S.C. §§ 1330, 1602, *et seq.*:

> If Congress wanted to tether international organization immunity to the law of foreign sovereign immunity as it existed at the time the IOIA was passed, it could have used language to expressly convey this intent. For example, Congress could have simply stated that international organizations would be entitled to the 'same immunity as of the date of this Act.' Or, it could have just specified the substantive scope of the immunity it was conferring. Because it did neither, we interpret the IOIA in light of the Reference Canon to mean that ***Congress intended that the immunity conferred by the IOIA would adapt with the law of foreign sovereign immunity.***

*OSS Nokalva, Inc. v. European Space Agency*, 617 F.3d 756, 766 (3d Cir. 2010) (emphasis added).[2] As discussed in *European Space Agency*, the purpose of the IOIA was "to confer upon international organizations, and officers and employees thereof, privileges and immunities ***of a governmental nature***." H.R. No. 1203 (1945) (annexed to the July 28, 2011 Declaration of Amanda L. Devereux ("Devereux Dec.") as Ex. 1) (emphasis added).[3] Thus, "the reasoning

---

1 The issue of whether the IOIA grants restrictive immunity appears to be a matter of first impression in this Circuit. *See Brzak v. United Nations*, 597 F.3d 107, 110 (2d Cir. 2010), *cert. den'd*, 131 S. Ct. 151 (2010) (court did not reach issue of immunity afforded international organizations by the IOIA where "even under the plaintiffs' interpretation of the IOIA, the United Nations would still be immune from suit.").

2 Significantly, the United States does not address the holding of the *European Space Agency* case, which was discussed in Plaintiff's initial brief at 10.

3 The House Report for the IOIA also emphasizes:

*(Footnote continued on next page)*

underlying FSIA's exception for suits arising out of a government's commercial transactions from the broad immunity it otherwise accords such a government is equally applicable to international organizations and is incorporated into the IOIA." *European Space Agency*, 617 F.3d at 766.

Significantly, and what the United States fails to mention, is that not long after the FSIA was enacted, the United States, through the State Department, made it clear that the FSIA applied to the IOIA and thus codified restrictive immunity for international organizations:

> The [FSIA] amended [United States] law by codifying a more restrictive theory of immunity subjecting foreign states to suit in U.S. courts in respect of their commercial activities . . . while continuing their exemption from U.S. jurisdiction for sovereign or governmental activities . . . international organizations now are subject to United States jurisdiction for their commercial activities, but retain immunity for their public acts.

*(Footnote continued from previous page)*

> . . .governments have traditionally granted to each other, and to the officials of each other, ***certain specific privileges, exemptions, and immunities*** .. . . there exists at the present time no law of the United States whereby this country can extend privileges of a governmental character with respect to international organizations or their officials in this country. It is to fill this need that this bill has been presented.

Devereux Dec., Ex. 1, at 102 (emphasis added).

The House Report also notes that the immunities granted to international organizations as of 1945 were subject to restrictions which had been "given careful study" as the bill "provide[d] for the revocation of the privileges from ***any organization*** in the event of the abuse of the privileges or for any other reason." *Id.* at 3 (emphasis added). Had Congress wished to carve out an exception for the United Nations and provide that it possessed immunities above and beyond those provided to other international organizations and to foreign states, it certainly could have done so.

*See also id.* at 6 ("the immunity from suit to be extended to officers and employees of international organizations is limited to immunity for acts performed by them in their official capacity whereas diplomatic officers enjoy full immunity from legal processes in this country.").

The Senate Report for the IOIA also acknowledges that the immunity granted to the United Nations was not "absolute," stating that the establishment of the United Nations headquarters in the United States "may in due course require the negotiation of a special agreement covering matters beyond the scope of this legislation." S. Rep. 861 (1945) (annexed to Devereux Dec. as Ex. 2), at 2.

(Letter from B. Owen, State Dept. Legal Adviser, to Leroy D. Clark, General Counsel, Equal Employment Opportunity Commission (June 24, 1980), *reprinted in* Marian L. Nash, *Contemporary Practice of the United States Relating to International Law*, 74 Am J. Int'l L. 917, 917-18 (1980) (annexed to Devereux Dec. as Ex. 3) "The State Department's direct pronouncement of IOIA immunity is persuasive, particularly because the State Department played an important role in drafting the IOIA." *European Space Agency*, 617 F.3d at 764 (citing Letter from Harold D. Smith, Director Bureau of the Budget, to James Francis Byrnes, Secretary of State, (Nov. 6, 1945), H.R. No. 1203 at 7). *See also* H.R. Rep. 105-802 (1998) (cited in *European Space Agency*, 617 F.3d at n.6):

> The legal status of INTELSAT's and Inmarsat's [two international organizations under the IOIA] immunity from suit is unclear. Under U.S. law, international organizations . . . generally have the same immunity as foreign governments, and the Foreign Sovereign Immunities Act (FSIA) . . . provides that foreign governments are not immune for actions taken in connection with their commercial activities. However, there is a lack of case law on this issue. It is particularly important to resolve this issue in the context of INTELSAT and Inmarsat, whose primary mission (unlike the primary missions of other international organizations) is to provide commercial services. . . . Thus this legislation addresses the issue of privileges and immunities and clarifies the law on this issue. It provides that INTELSAT and Inmarsat are not immune from suit or legal process in connection with their commercial activities . . .[4]

H.R. Rep. 105-802, at *13.

Although the position of the United States may be "worth careful consideration, if not deference," *European Space Agency*, 617 F.3d at 764, in this instance the position espoused in the United States' Statement of Interest is simply not consistent with the plain language of the IOIA, its legislative history, and the United States' own past statements. It is understandable that

[4] The International Anti-Bribery and Fair Competition Act of 1998 amended the Securities and Exchange Act of 1934 and the Foreign Corrupt Practices Act of 1977 .

the State Department may face pressures from time to time to lobby for the immunity of a particular foreign state or international organization –indeed, it was for just that reason that the FSIA was enacted – to remove the question from the State Department and place it squarely under the jurisdiction of the courts, thus ensuring that immunity determinations would be made by an impartial application of law not influenced by transitory pressures and the power of a particular defendant.[5] However, the State Department cannot simply change its mind about the meaning of the IOIA to suit its mood. In light of the authorities cited above and the plain language of the IOIA, the United States' position in its Statement of Interest is simply not credible on that point. The FSIA applies to the IOIA, and therefore no international organization, including the United Nations, is immune from disputes arising from commercial activities.

B. Under the U.N. Charter, the U.N. Has Functional, not Absolute, Immunity, which Does Not Extend to Commercial Activity.

Although the United States denies any conflict between the U.N. Charter and its proffered interpretation of the Convention (*see* U.S. Stmt. at 7-8), Article 105 of the Charter plainly provides for ***functional*** immunity (". . .such privileges and immunities as are necessary for the fulfillment of its purposes."). To the extent that the Convention is interpreted as

---

5 *See* H.R. Rep. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, at *7:

> Today, when a foreign state wishes to assert immunity, it will often request the Department of State to make a formal suggestion of immunity to the court. Although the State Department espouses the restrictive principle of immunity, the foreign state may attempt to bring diplomatic influences to bear upon the State Department's determination. A principal purpose of this bill is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process. The Department of State would be freed from pressures from foreign governments to recognize their immunity from suit and from any adverse consequences resulting from an unwillingness of the Department to support that immunity.

providing for absolute rather than functional immunity, the two documents are in conflict and the Charter must prevail.[6] The United States' argument, that Article 105 could be taken to mean that "such privileges and immunities as are necessary for the fulfillment of its purposes" means absolute immunity, ignores the plain language of the Charter, the preamble of the Convention, the rest of the language of the Convention, and the relevant context.[7] Had the drafters of the Charter meant to provide for absolute immunity, they certainly could have done so with clear language. Rather, they provided that the privileges and immunities to be granted to the U.N. would be related to the U.N.'s functions and essential to carrying out those functions.

Article 105 of the U.N. Charter was clearly intended to grant ***functional*** immunity:

> . . under Article 105 of the Charter, the obligation of all members to accord to the United Nations, its officials and the representatives of its members all ***privileges and immunities necessary for the accomplishment of its purposes***, operates from the coming into force of the Charter . . .

*Report of the Preliminary Commission of the United Nations*, Dec. 20, 1945, U.N. Document PC/20 (annexed to Devereux Dec. as Ex. 4), at 60 (emphasis added); *see also* United Nations Secretariat, Handbook on the Legal Status, Privileges and Immunities of the United Nations, Notes on the Drafting of Articles 104 and 105 of the United Nations Charter, 16 (1952), U.N. Document ST/LEG/2 ("Handbook") (annexed to Devereux Dec. as Ex. 5):

> The terms privileges and immunities [in the U.N. Charter] . . . indicated in a general way all that could be considered ***necessary*** to the realization of the purposes of the Organization, to the full

---

6 Pursuant to Article 103 of the U.N. Charter, in the event of a conflict between Article 105 and the terms of the Convention, Article 105 governs.

7 In interpreting treaties, courts may look to evidence regarding the purpose and intent of the drafters, as well as the preamble to the treaty. *See* Restatement (Third) of Foreign Relations Law of the United States ("Restatement") § 325(1) ("An international agreement is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in the light of its object and purpose."); *Cornejo v. County of San Diego*, 504 F.3d 853, 857 (9th Cir. 2007) ("the 'context' of a treaty includes its preamble").

> ***functioning*** of its organs, and to the independent exercise of the functions and duties of their officials.

*Id.* at 9 (emphasis added).[8]

Although the immunities of the U.N. are "broad indeed," they are not absolute (*see* Pl. Br., Ex. 6, at 168), and certainly cannot be plausibly construed as extending to the U.N. the ability to unilaterally avoid paying private actors for services rendered under commercial contracts. As the drafters acknowledged, attempting to provide the U.N. with something beyond functional immunity is unwise and would threaten the organization's legitimacy. No other good faith interpretation "in accordance with the ordinary meaning" of the terms of the Charter and Convention "in their context and in the light of [their] object and purpose" (*see* Restatement § 325(1)) is possible.

C. The Cases Relied upon by the United States Are Highly Distinguishable from the Instant Case, which is a Matter of First Impression.

The United States rests its argument on the fact that no United States court appears to have yet exercised jurisdiction over the United Nations. As noted in Plaintiff's initial brief (*see* Pl. Br. at 12-13), decisions finding the United Nations to be immune from jurisdiction have largely involved claims by United Nations employees,[9] while one case deals with functions of

---

[8] The Handbook also states:

> It is to be noted that [Article 104, stating that the U.N. shall have legal capacity "as may be necessary for the exercise of its functions and the fulfilment [sic] of its purposes"] is conceived in very general terms. It is confined to a state of the obligation incumbent upon each Member State to act in such a way that the Organization enjoys in its territory a juridical status ***permitting it to exercise its functions***.

Devereux Dec., Ex. 5, at 5 (emphasis added).

[9] The United Nations' relationship with its employees is protected by its functional immunity and does not fall under the "commercial activity" exception. *See, e.g.*, *Boimah v. United Nations Gen. Assembly*, 664 F. Supp. 69, 72 (E.D.N.Y. 1987) ("an international organization's self-regulation of its employment practices is an activity essential to the 'fulfillment of its purposes,' and thus an area to which immunity must extend.").

the United Nations such as military operations.[10] There appear to be no cases, however, in which a court has ruled the United Nations has absolute immunity in breach of contract actions arising out of a private commercial contract, as the United States urges here. Such an application would, thus, broaden the scope of the United Nations' immunity beyond what has previously been recognized by any United States court. Thus, the cases cited by the United States are readily distinguishable.[11] In addition, the United States' assertion that *Brzak* "rejected a contention similar to Plaintiff's here" (U.S. Stmt., at 12) mis-applies *Brzak*. The Plaintiff in *Brzak*, a dissatisfied U.N. employee, disputed the conclusions of the U.N.'s internal administrative dispute resolution process for employment claims. 597 F.3d at 110. Plaintiff – who has a claim arising out of commercial activity performed by private actors, and not an employment dispute – has had no similar opportunity to have his claim heard at all.

The United States' position is premised, at least in part, on its assumption that UNDP will comply with its obligations under the General Convention, and provide for arbitration of this dispute. *See* U.S. Stmt., at 7 (". . . the General Convention requires the UN to establish arbitration procedures to settle contract disputes. . . . The UN's provisions for non-judicial dispute resolution provide an alternative to judicial proceedings that mitigates any effects of the UN's immunity from suit or process in member states' court systems.").

---

[10] *See Askir v. Boutros-Ghali*, 933 F. Supp. 368, 372-73 (S.D.N.Y. 1996) (case concerned "operation of a military logistics and supply base" which was "not commercial" activity).

[11] *See De Luca v. United Nations Org.*, 841 F. Supp. 531, 532-33 (S.D.N.Y. 1994) (plaintiff, a former U.N. employee, alleged U.N. improperly targeted him for auditing and improperly refused to reimburse taxes withheld from his UN salary); *Boimah v. United Nations Gen. Assembly*, 664 F. Supp. 69, 70 (E.D.N.Y. 1987) (plaintiff brought employment discrimination claim against U.N., alleging he was denied a permanent position because of his race and African nationality); *Askir*, *supra*, 933 F. Supp. at 369 (plaintiff sought damages for U.N.'s occupation of his property during military operation in Somalia); *Brzak*, *supra*, 597 F.3d at 110 (plaintiffs disputed findings of U.N.'s internal employee dispute resolution system); *Shamsee v. Shamsee*, 74 A.D.2d 357, 359 (2d Dep't 1980) (plaintiff sought sequestration order against retired U.N. employee, whose chief asset was a share in the U.N. Joint Staff Pension Fund); *Hunter v. United Nations*, 2004 N.Y. Slip. Op. 51751U, at *1-2 (Sup. Ct. N.Y. Cty. 2004) (UNICEF employee alleged racial and national origin discrimination and hostile work environment).

Here, however, UNDP has refused to arbitrate the issues that are at issue in this case. Plaintiff reiterates in that respect that if UNDP agrees to submit this dispute to arbitration – including any issues raised in UNDP's April 14, 2011 letter to the United States Mission to the United Nations (*see* U.S. Stmt., Ex. 2), this action could be discontinued. Mr. Mathias' letter to the United States asserts that there is no contract between Plaintiff and UNDP. *See* U.S. Stmt., Ex. 2. That statement is demonstrably false, as set forth in the Complaint (*see* Comp., ¶¶ 27-29), and exhibits thereto (*see* Comp., Exs. B and C). Accordingly, UNDP has a Convention obligation to arbitrate this dispute with Plaintiff.

The question at issue in the instant case – whether the United Nations' immunity extends to private commercial contracts – appears to be a case of first impression. *European Space Agency*, discussed above in Point I.A, appears to be the only case in which a United States court has determined whether an international organization was entitled to immunity over commercial contract claims. For the reasons discussed above, Plaintiff urges the Court to adopt the holding of *European Space Agency* and exercise jurisdiction over UNDP.

D. In *UNESCO v. Boulois*, the Court Exercised Jurisdiction over the U.N. to Enforce the Parties' Contract Requiring Arbitration.

The United States misconstrues the opinion in *UNESCO v. Boulois*. In that case, a French appellate court affirmed the lower court's decision and ordered the United Nations Educational, Scientific, and Cultural Organization ("UNESCO") to proceed with arbitration pursuant to the terms of the parties' contract. *See* Devereux Dec., Ex. 7, at 2-4. The court also 1) ordered UNESCO to pay Boulois 15,000 francs pursuant to a provision of French law allowing courts to order the losing party to reimburse the prevailing party for limited costs; and 2) ordered UNESCO to pay full court costs. *Id.* at 4. Thus, it is clear from the opinion in

*UNESCO v. Boulois* that the French court did indeed exercise jurisdiction over a U.N. entity, including ordering it to take certain actions and make payments.

The United States' attempt to distinguish the instant case on the grounds that an arbitration clause was enforced in *UNESCO v. Boulois* is unavailing. In *UNESCO v. Boulois*, the court enforced the parties' contractual agreement to arbitrate, which the court, exercising its jurisdiction, found to be valid. Like the appellee in *UNESCO v. Boulois*, Plaintiff asks this Court to exercise its jurisdiction and enforce a contract. The United States' argument that the French court "did not exercise jurisdiction over UNESCO on the substance of the dispute" (U.S. Stmt., at 12) is similarly unavailing. As in United States courts, French courts do not determine the merits of an action where a dispute is arbitrable. Both the lower court and appellate court did, however, exercise jurisdiction over UNESCO, make factual and legal findings, and issue orders in Boulois' favor.

Further, the United States' statement that the court in *UNESCO v. Boulois* "relied on the European Convention on Human Rights" mischaracterizes the court's opinion. The court explicitly stated that the reason for its decision was that, **even if UNESCO was entitled to immunity from jurisdiction**, by virtue of its status as an international organization and a treaty signed by France, **it was nevertheless subject to the principle of *pacta sunt servanda*** ("agreements must be kept").[12] Having reached its conclusion, the court went on to state in *dicta* that granting UNESCO's request – that the lower court's order be vacated and Boulois ordered to pay UNESCO 20,000 francs in costs – would be "contrary to public policy" because it would constitute a "denial of justice" and a violation of Article 6(1) of the European Convention for the Protection of Human Rights and Fundamental Liberties (which pertains to the right to a fair

[12] As stated below in Point I.E, a necessary corollary of the U.N.'s legal capacity to enter into private contracts is its duty to honor those contracts.

hearing in civil and criminal matters).[13] Thus, the clear foundation of the opinion in *UNESCO v. Boulois* is the basic principle of *pacta sunt servanda*, which should also be applied in this case. Immunity does not equal impunity.

E. Requiring UNDP to Take Responsibility for Its Contractual Obligations in the Instant Case Will Not Interfere with the Operation of UNDP.

The United States' argument that enforcing Plaintiff's contract would "repeatedly embroil[] the UN in litigation" and nullify the Convention (U.S. Stmt., at 12) is exaggerated and without merit. There is simply no plausible basis for the conclusion that enforcement of one commercial contract that was freely entered into by UNDP will endanger the United States' treaty obligations and rock the foundations of the United Nations.

*First*, UNDP is free to include arbitration or other ADR provisions in its commercial contracts – as is its custom under its own internal policies. UNDP is also free to agree to arbitration clauses after the fact in instances where an arbitration clause was not included in the original contract – which Plaintiff here has repeatedly agreed to. In doing so, UNDP is free to negotiate for any procedural process, seat-of-arbitration, and choice-of-law it may desire, thus ensuring predictability and uniformity. There is no reason to conclude that a decision by this Court in Plaintiff's favor would expose UNDP to a single additional case. UNDP was not required to employ the commercial services of Plaintiff, a Turkish business, in Iraq. Nor was Plaintiff an employee of UNDP. Rather, UNDP ***chose*** to engage the commercial dry-docking services of Plaintiff, ***just as any private actor could do***. If UNDP was dissatisfied with the terms offered by Plaintiff, it had every right to negotiate for different terms or choose another company

[13] Even if the basis of the court's opinion were that UNESCO's position was "contrary to public policy," a "denial of justice," and a violation of Article 6(1), it would still serve to demonstrate that other principles of law trump the treaty interpretation urged by the United Nations – namely, public policy, fundamental notions of fair play and justice, and due process.

to provide services. Instead, UNDP lulled Plaintiff into believing he would be paid for services rendered under the parties' contract, benefited from Plaintiff's services, and now seeks to prevent Plaintiff from seeking justice under any forum.

*Second*, this case involves simple contract claims that would be decided pursuant to well-established basic principles of contract law and customary norms.[14] *Cf. Boimah*, *supra*, 664 F. Supp. at 71-72 ("Undercutting uniformity in the application of staff rules or regulations would undermine the ability of the organization to function effectively." (quoting *Broadbent v. Org. of Am. States*, 628 F.2d 27, 34-35 (D.C. Cir. 1980))).

*Third*, the fact that no case appears to address the question of enforcement of a commercial contract against the United Nations demonstrates the rarity of such disputes. Indeed, it has been documented that commercial arbitration disputes with the United Nations –although they do take place when the United Nations complies with its contractual obligations to arbitrate – are very few and far between.[15] Thus, it is hardly likely that the United Nations would become

---

[14] *See also Report of the Secretary-General on procurement-related arbitration*, Oct. 14, 2011, U.N. Document A/54/458 (annexed to Devereux Dec. as Ex. 9), at 5, ¶ 15 ("While arbitration is an alternative to litigating in the domestic courts of a Member State and is intended to be considerably less formal and time-consuming, it is still a form of litigation requiring the special training and skills of a litigator."); ¶ 17 ("Notably, resolution of disputes under major contracts have typically involved arbitration in New York. . . . it is usually in the interests of the Organization for its counsel to be located in or near New York.").

[15] *See Procedures in place for implementation of article VIII, section 29, of the Convention on the Privileges and Immunities of the United Nations, adopted by the General Assembly on 13 February 1946*, Apr. 24, 1995, U.N. Document A/C.5/49/65 (Pl. Br., Ex. 7), at 8, ¶ 21:

> In the vast majority of cases [regarding claims arising from commercial agreements between the United Nations and private firms or individuals], a settlement of the matter has been reached through direct negotiations between the parties (either in the field or at Headquarters). In the few cases where the Organization has not been able to negotiate a settlement of the matter, it has resorted to arbitral proceedings.

*See also* Devereux Dec., Ex. 9, at 4, ¶ 12:

> Given the risks and costs associated with arbitration, every effort is made, consistent with the interest of the Organization, to reach negotiated settlements of contract claims with contractors. This has proved successful with the overwhelming majority of claims.

*See also id.* at 3, ¶ 4 (noting there were, at that time, only 4 pending arbitration cases and between 1995 and 1999 there were only 12 arbitration cases involving the United Nations).

*(Footnote continued on next page)*

"embroiled[]" in litigation concerning commercial contracts. All that the United Nations needs to do to avoid this is to comply with its Convention obligation to provide for an arbitral forum of contract disputes. Had it done so here, this proceeding would have been avoided.

*Fourth*, requiring UNDP to follow through with its obligations under commercial contracts would hardly constrain the U.N. in its abilities to perform its functions and carry out its purposes. This is not a case concerning the internal operations of the U.N. by a disgruntled employee, or a tort case challenging the U.N.'s decisions during a peacekeeping operation. This is a commercial contract case, seeking only monetary damages in the amount UNDP freely committed itself to pay. The corollary of the U.N.'s legal capacity to enter into commercial contracts is its duty to honor those contracts. Enforcing UNDP's commercial contracts will not impact any legitimate goals of UNDP or the U.N.[16]

*Finally*, this dispute arises not only from commercial activity, but from commercial activity that was itself unrelated to UNDP's necessary and official functions. UNDP's stated goal was to profit by selling the ships lifted and scrapped by Plaintiff for scrap metal. (*See* Comp., ¶¶ 25, 42, 49.) Profiteering from scrap metal sales in the wake of a displaced government can hardly be considered a necessary function of UNDP.

## CONCLUSION

---

*(Footnote continued from previous page)*

The U.N. also acknowledges that "when compared to the total value of procurement contracts awarded by the Organization, the number and monetary value of arbitration cases has been very small." *Id.* The U.N. also states that the U.N. only became involved in a significant number of arbitrations as a result of its "switch from traditional reliance on Member State Governments for the provision of a wide range of support services to the use of commercial vendors." *Id.* at ¶ 5.

16 *See* Devereux Dec., Ex. 9, at 5, ¶ 14 ("once it is known that a dispute has arisen and may be proceeding to arbitration, as a matter of financial prudence and where feasible, the validity of available obligated funds in approved peacekeeping mission budgets for non-governmental liabilities is extended and maintained to cover the potential liability.").

Based on the foregoing, in the event UNDP continues to refuse to fulfill its obligation to arbitrate this commercial dispute with Plaintiff, the Court should order that this litigation proceed to a hearing on the merits.

Dated: New York, New York
July 28, 2011

Respectfully submitted,

/s/ Amanda L. Devereux
Robert C. Sentner
Edward C. O'Callaghan
Amanda L. Devereux
Sherli Yeroushalmi
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
(212) 940-3000
rsenter@nixonpeabody.com

*Attorneys for Plaintiff*